**In re FEDERAL–MOGUL GLOBAL, INC., Federal–Mogul Limited f/k/a T & N Limited, et al., Debtor(s).**

**No. 01–10578 (JKF).**

United States Bankruptcy Court, D. Delaware.

Oct. 27, 2010.

Jack E. Grayer, Pharr, TX, for Debtor.

# MEMORANDUM OPINION[1]

JUDITH K. FITZGERALD,
Bankruptcy Judge.

The matter before the court is a motion for summary judgment filed by Debtors Federal–Mogul Corporation ("FMC") and Federal–Mogul Products, Inc. ("FMP") with respect to their objection to PepsiAmericas, Inc.'s ("PAS") amended proof of claim.[2] PAS filed identical claims, numbers 6093 and 6441, against Federal–Mogul Corporation ("FMC") and Federal–Mogul Products, Inc. ("FMP") (collectively "Debtors"). PAS asserts as bases for its claims "[t]ort, conversion, and breach of good faith and fair dealing regarding insurance policies." The Debtors' objection to the claims is that no factual basis has been stated by PAS that substantiates the validity or amount of any liability of the Debtors. In fact, the claims do not even identify the alleged tort (except conversion), do not explain how the policies were (allegedly) converted, or set forth the basis for any supposed duty of good faith or fair dealing owed by the Debtors to PAS. Rather, the disputed claims consist of a list of causes of action.[3] PAS has not alleged facts that might establish the basis for any tort or the existence of a special relationship between Debtors and PAS. The parties rely on several documents which will

---

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

2. The objection to claim is at Doc. No. 11391. At a hearing on November 24, 2008, counsel for Debtors informed the court that PAS had filed an administrative proof of claim. The Debtors' time to object to administrative and other claims was extended through June 27, 2010. Doc. No. 14557, at 6. We are not addressing the administrative proof of claim here but note that at a hearing on November 24, 2008, Debtors' counsel took the position that the ruling on the prepetition claim "may shed some light into ... the ... administrative claim." Tr. of 11/24/08, Doc. No. 14440, at 7.

3. In order to establish a prima facie case of conversion, for example, PAS would have to provide evidence necessary to establish the common law elements of a conversion, i.e. the unauthorized intentional exercise of dominion or control over property in a manner which interfered with the owner's rights to that property. See Restatement (Second) of Torts § 222A (1965). In order to establish an implied duty of good faith and fair dealing between two parties, those parties must be in privity.

be explained below. As to those documents, PAS agrees that FMP was not a party to the 1988 Stock Purchase Agreement ("1988 SPA"), Doc. No. 12323[4] at 7, ¶ 20, but asserts "common law obligations,"[5] notwithstanding the absence of a contractual obligation of FMP to PAS under the 1988 SPA. Doc. No. 12323 at 8, ¶ 22. PAS also agrees that neither it nor any of its predecessors is a party to the 1994 Asset Purchase Agreement ("1994 APA"), *id.*, at 16, ¶ 32, or 1998 Purchase and Sale Agreement ("P & SA") between Cooper Industries, Inc. and FMC. *Id.* at 20, ¶ 50.

Summary judgment is appropriate when " 'there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.' To be material, a disputed fact must be one that might 'affect the outcome of the suit under governing law.' " *Smith v. Johnson and Johnson,* 593 F.3d 280, 284 (3d Cir.2010). PAS contends that disputed facts exist. However, there is a difference between what the facts *are* and what they *mean* and PAS's challenge is to the meaning of undisputed facts.

For the reasons which follow we will grant Debtors' motion for summary judgment and sustain their objection to PAS's claims inasmuch as we find that the entity from which PAS contends that its claims derive does not have the asserted obligation to PAS. The use of identical corporate names and similar corporate names is, to a great degree, the reason why close analysis of the relevant documents is required to determine this dispute.

*Relevant Documents*

The corporate histories of the entities that eventually became known as PAS and FMC/FMP are complex and the contract documents upon which this decision depends were executed by their predecessors in interest and/or parent(s) or indirect parent(s). Previous Memorandum Opinions of this court explain the corporate histories and relationships of and between the PAS-related chain of entities and the Federal–Mogul–related chain of entities. *See* excerpts from *In re Federal–Mogul Global Inc.,* 411 B.R. 148, 160–62 (Bankr.D.Del. 2008), at Appendix A, and *In re Federal–Mogul, Inc.,* 2007 WL 4180545 (Bankr. D.Del., November 16, 2007) at *13–15 (citations omitted), at Appendix B. For purposes of this Memorandum Opinion, Abex Corporation (not Abex, Inc., *see infra*), IC Industries, Whitman, Pneumo Corporation,[6] Pneumo Abex Corporation ("PAC 1")[7] were, at one time or another, in the PAS chain. Similarly, Wagner Electric Corporation and Moog Automotive, Inc., are in the FMC/FMP chain. PA Holdings, the Henley Group, Abex, Inc. and Pneumo Abex Corporation ("PAC 2") are entirely distinct entities from the PAS and the FMC/FMP chains.

The principal documents upon which the decision in this Memorandum Opinion depends are (1) the 1988 Stock Purchase

---

4. Objection and Response to Statement of Undisputed Material Facts in Support of Debtors' Motion for Summary Judgment filed on behalf of PAS.

5. PAS argues that under the 1988 SPA Abex Corporation and "Pneumo Abex Corporation" were not freed from their common law obligations of good faith and fair dealing to PAS. PAS also argues that these entities "always have been subject to the common law duty of the indemnitee not to increase the burden of the indemnitor." Doc. No. 12323 at 8, ¶ 22.

6. Pneumo Corporation is to be distinguished from Pneumo Abex Corporation as the latter is a successor to PA Holdings Corp.

7. There were two entities named Pneumo Abex Corporation. What is referred to herein as "PAC 2" was formerly PA Holdings. *See* text *infra* at 10.

Agreement ("1988 SPA") between IC Industries, Inc. (eventually Whitman Corporation then PAS), and PA Holdings Corporation, Exhibit C to Doc. No. 11886, and (2) the 1994 Asset Purchase Agreement ("1994 APA") between Pneumo Abex Corporation (PAC 2, successor to PA Holdings) and Wagner Electric Corporation (predecessor to FMP).

Other documents include a Mutual Guaranty Agreement between Abex, Inc. and Cooper Industries, Inc., executed in connection with the 1994 APA, a 1994 Insurance Agreement between Pneumo Abex Corporation and Wagner Electric Corporation, three other insurance agreements which were not mentioned in the pleadings but which PAS filed under seal with leave of court, after raising their existence during the argument,[8] and a 1998 Purchase and Sale Agreement ("1998 P & SA") executed by FMC and Cooper Industries, Inc., the indirect parent of Wagner Electric (Wagner is now FMP).

*The 1988 Stock Purchase Agreement ("1988 SPA")*

The 1988 SPA is comprised of the original stock purchase agreement between IC Industries, Inc. and PA Holdings Corporation, and two amendments. The three agreements are collectively referred to as the "1988 SPA." The First Amendment was dated August 29, 1988, and was between IC Industries, Inc. and PA Holdings Corporation. By the time of the Second Amendment to the SPA, dated September 23, 1991, IC Industries had changed its name to Whitman Corporation and PA Holdings had become Pneumo Abex Corporation [9] (referred to herein as "PAC 2"). Thus, the Second Amendment was between Whitman and Pneumo Abex Corporation, "formerly PA Holdings Corporation." Collectively, the three 1988 agreements (i.e., the original plus two amendments) are referred to in other documents, particularly the 1994 Asset Purchase Agreement, as "the Whitman Agreements." *See* note 10 *infra*. The 1994 APA defines the Whitman Agreements to include "(i) the Whitman Stock Purchase Agreement [the 1988 SPA], and (ii) the Settlement Agreement between Whitman Corporation and Pneumo Abex Corporation dated as of September 23, 1991." Doc. No. 11886 at Exhibit D, 1994 APA, at 13 (definition of Whitman Agreement) (the 1988 SPA).[10] The 1994 APA further defines the Whitman Stock Purchase Agreement as the 1988 SPA "between IC Industries, Inc. and PA Holdings Corporation, as amended by a First Amendment dated as of August 29, 1988, by a Second Amendment executed on September 23, 1991[,] and by" a letter dated November 19, 1991, regarding a protocol for asserting insurance claims. Exhibit D, 1994 APA, at 14.[11]

---

8. The three agreements under seal are (1) May 2000 Confidential Settlement Agreement between Pneumo Abex Corporation and Whitman Corporation, (2) December 2002 Final Settlement Agreement Between Pneumo Abex Corporation and Maryland Casualty Company, and (3) December 2006 Confidential Settlement Agreement And Release between Pneumo Abex LLC, Cooper Industries, PAS, FMP, FMC and Certain Underwriters at Lloyd's. *See* note 25, *infra*.

9. There are two entities that use the name "Pneumo Abex Corporation." For clarity, we will designate them as "PAC 1" and "PAC 2."

10. The "Settlement Agreement" referred to in the definition of "Whitman Agreements" in the 1994 APA means the Second Amendment to the 1988 SPA. The Second Amendment, by its terms, was executed because disputes had arisen between the parties to the 1988 SPA and the Second Amendment constituted the terms of the settlement of those disputes.

11. The Second Amendment itself is undated but the 1994 APA, at Section 3.20, provides the date of the Second Amendment as September 23, 1991. *See* Exhibit D, 1994 APA, at Section. 3.20.

*The 1994 Asset Purchase Agreement ("1994 APA")*

The 1994 APA is between Pneumo Abex Corporation and Wagner Electric Corporation. A Mutual Guaranty Agreement between Abex, Inc., and Cooper Industries, Inc., was executed on December 30, 1994, with respect to the 1994 APA. *See* Mutual Guaranty Agreement, Doc. No. 12606 at 01–10578 15. In the Mutual Guaranty Abex and Cooper guaranteed, as direct obligors and not as sureties, to each other and to each other's subsidiaries (the parties to the 1994 APA) "absolutely and unconditionally ... the full and prompt payment when and as due of all amounts payable under the [APA] by such Guarantor's subsidiary ... and the full and prompt performance by such Guarantor's subsidiary which is a party to the [APA] of all its undertakings and obligations under

the [APA]." [12] At that time, Cooper was an indirect parent of Wagner Electric as the result of a series of transactions between 1967 and 1985.[13] As explained in Cooper's Reply to PAS's objections to Debtors' disclosure statement, there was also an insurance agreement executed in connection with the 1994 APA. Doc. No. 11435, Joint Reply of Cooper Industries, LLC and Pneumo Abex LLC to the Objections of PepsiAmericas, Inc. and Certain Mesothelioma Claimants, at 4, ¶ 6. The insurance agreement was between PAC 2 and Wagner Electric, dated December 30, 1994. *See* Exhibit E to Doc No. 11886. According to Cooper, "[t]he insurance that offsets the Wagner asbestos-related indemnity is the same insurance that offsets the PAS Indemnities (with respect to asbestos-related claims for which PAS remains responsible)." *Id.*[14]

**12.** Further description of the Mutual Guaranty Agreement follows in text *infra*.

**13.** *See In re Federal–Mogul Global, Inc.*, 2007 WL 4180545 at * 13–* 14:

Wagner went through several changes of corporate ownership prior to the acquisition of the Wagner business by the Federal–Mogul Group. In particular, in 1967 all of the stock of Wagner was purchased by Studebaker Corporation, which was in turn a wholly-owned subsidiary of Studebaker–Worthington, Inc..... On October 23, 1979, the common stock of Studebaker–Worthington was purchased by Edison International, Inc ...., which was a wholly-owned subsidiary of McGraw–Edison Company.... On January 2, 1981, Studebaker–Worthington merged into Edison, resulting in Wagner becoming a subsidiary of Edison, which, in turn, was a direct subsidiary of McGraw–Edison....

In 1985, Cooper Industries, Inc. purchased all of the stock of McGraw–Edison. As a result of this transaction, Wagner became an indirect wholly-owned subsidiary of Cooper Industries, Inc..... On January 1, 1997, Wagner was merged into another wholly-owned subsidiary of Cooper Industries, Inc., Moog Automotive, Inc..... The

combined Wagner/Moog entity retained the Moog name.
Moog later became FMP.

**14.** The Joint Reply of Cooper at Doc. No. 11435, at 2–3, ¶¶ 2–4, further explains:

In a transaction effected in August 1988, IC Industries, Inc. ("IC Industries"), a corporate predecessor of PAS, sold the stock of Pneumo Abex Corporation, Abex Corporation and certain other IC Industries' subsidiaries to PA Holdings Corporation ("PA Holdings"). Through internal reorganizations, Pneumo Abex LLC (referred to in this Joint Reply as "Pneumo Abex") is the successor to Pneumo Abex Corporation, Abex Corporation and PA Holdings.

Pursuant to the terms of the governing Stock Purchase Agreement, as amended (the "1988 Agreement") for the 1988 transaction, PAS (as successor to IC Industries) indemnifies Pneumo Abex (as successor to PA Holdings, Pneumo Abex Corporation and Abex Corporation) for a wide variety of matters (such indemnity rights, the "PAS Indemnities"). The PAS Indemnities include, among other things, indemnification against: (i) asbestos personal injury claims involving automotive and industrial friction products shipped prior to the 1988 transac-

Under a Purchase and Sale Agreement between Cooper and Debtor FMC, dated August 17, 1998 ("1998 P & SA"), Cooper sold shares of Moog and other assets to FMC. Pursuant to the 1998 P & SA, FMC assumed Cooper's mutual guaranty obligations related to the 1994 APA and indemnified Cooper for any liability related to the mutual guaranty. *In re Federal–Mogul Global, Inc.,* 411 B.R. 148, 162 (Bankr.D.Del.2008). Following the 1998 P & SA, Moog changed its name to Federal Mogul Products, Inc. ("FMP"). In its capacity as successor to the indemnity obligation originally undertaken by Wagner in the 1994 APA, FMP took responsibility for handling Pneumo Asbestos Claims. Thus, an asbestos-related claim arising out of the Moog friction products division received by PAC 2, a distinct entity, would have been subject to the assumed liabilities under the 1994 APA and indemnified by FMP.[15] *Id.* Of significance to this Memorandum Opinion is the following:

*Corporate History* [16]

In 1968 Abex Corporation was acquired by IC Industries, Inc., predecessor to

---

tion and filed by August 29, 1998 (a ten-year window), (ii) asbestos personal injury claims involving railroad and other products (other than automotive and industrial brakes), and certain other lines of business, whenever filed, and (iii) all environmental matters arising out of activities before the 1988 transaction.

In addition to this indemnity, Pneumo Abex, through its predecessors' status as a named insured or an additional named insured under comprehensive general liability, umbrella and excess policies issued to Abex Corporation and IC Industries, has the benefit of extensive insurance covering these liabilities. The PAS Indemnities apply net of any insurance actually recovered for the indemnified liabilities. Except to the extent that time-limited indemnities for automotive and industrial brakes have expired, the PAS Indemnities remain in effect today.

The insurance agreement referred to in the Joint Reply is Exhibit E to Doc. No. 11886 and is between Pneumo Abex Corporation and Wagner Electric Corporation dated December 30, 1994.

**15.** These indemnities of "Pneumo Abex" by FMP regarding asbestos-related claims arise from the Abex Brake Business. PAS indemnified Pneumo Abex with respect to other asbestos-related claims. Declaration of Steven L. Fasman, President of Pneumo Abex LLC, Doc. No. 12606 at 5. Thus, PAS's claims with respect to the Abex policies is misplaced. *See also In re Federal–Mogul Global Inc.,* 411 B.R. 148, 162–64 (Bankr.D.Del.2008).

**16.** The Declaration of Steven L. Fasman, President of Pneumo Abex LLC, Doc. No.

12606, explains the corporate history in detail. As we explained in our 2008 Memorandum Opinion published in this case at 411 B.R. 148, 160–61,

> In 1988, IC Industries, Inc., sold the capital stock of Abex Corporation, Pneumo Abex Corporation, and other subsidiaries to PA Holdings Corporation, an affiliate of The Henley Group. In June and August of 1990, the assets and liabilities of Pneumo Abex Corporation and Abex Corporation were consolidated into their parent, PA Holdings Corporation. Both Abex Corporation and Pneumo Abex Corporation ceased to exist subsequent to this 1990 "roll-up." In November of 1990, PA Holdings Corporation was renamed Pneumo Abex Corporation, which is a different legal entity from the aforementioned Pneumo Abex Corporation that was part of the 1990 "roll-up."
>
> In 1992, the Henley Group engaged in a series of transactions, the net effect of which was to spin off Pneumo Abex Corporation into an entity that would be independent of the Henley Group. Specifically, the owner of the Pneumo Abex Corporation, Henley Investment Inc. (a subsidiary of The Henley Group, Inc.) changed its name to Abex Inc. in 1992. Then, pursuant to an Agreement and Plan of Merger dated as of March 26, 1992, The Henley Group, Inc. distributed all of the issued and outstanding shares of the common stock of Abex Inc. to the holders of the common stock of The Henley Group, Inc. Concurrent with the Agreement and Plan of Merger, The Henley Group, Inc., through multiple transactions, transferred certain of its assets and liabili-

Whitman Corporation and ultimately PepsiAmericas, Inc. ("PAS"). Pneumo Corporation was acquired by IC Industries in 1984 and in 1985 was renamed Pneumo Abex Corporation ("PAC 1"). In 1988 IC Industries/Whitman/PAS sold Abex Corporation and Pneumo Abex stock to PA Holdings Corporation, which was owned by Henley Investment Inc., a subsidiary of The Henley Group. Therefore, PAC 1 was no longer owned by IC Industries/Whitman/PAS. As stated, the 1988 SPA was executed by IC Industries, now PAS, as the seller. In 1988 IC Industries sold the capital stock of Abex Corporation, Pneumo Abex Corporation, and other subsidiaries to PA Holdings Corporation, an affiliate of The Henley Group. In 1990, the assets and liabilities of Abex Corporation and Pneumo Abex (PAC 1) were consolidated into their parent, PA Holdings (which was owned by Henley Investment, Inc.). *In re Federal–Mogul Global, Inc.,* 411 B.R. 148, 160 (Bankr.D.Del.2008). By the time the Second Amendment to the 1988 SPA was executed in 1991, IC Industries had become Whitman. Whitman executed the Second Amendment. PA Holdings Corporation had undergone a name change to become Pneumo Abex Corporation (PAC 2). Thus, the Pneumo Abex Corporation (PAC 2) that signed the Second Amend-

ment was not the entity which had been acquired by IC Industries/Whitman/PAS in 1984. The Pneumo Abex Corporation that signed the Second Amendment was formerly PA Holdings and was owned by Henley Investment, Inc. Corporation ("PAC 2"), a distinct entity.[17]

Henley Investment, Inc., the owner of PAC 2, changed its name to Abex Inc. in 1992. That same year, pursuant to a merger agreement, Abex Inc.'s parent, The Henley Group, distributed Abex Inc. stock to The Henley Group common stockholders. The Henley Group then transferred certain of its own assets and liabilities to PAC 2, Abex Inc.'s subsidiary. *See* Appendix A. Thus, well before the 1994 APA, IC Industries/Whitman/PAS and PAC 2 no longer had a corporate relationship.[18]

In 1994, PAC 2 sold certain assets of its friction products division (the Abex Corporation land vehicle friction products business assets) to Wagner Electric Corporation (now FMP) (the "1994 APA"). Under that agreement Wagner agreed to indemnify PAC 2 with respect to certain liabilities. Under Section 2.3 of the 1994 APA Wagner agreed that it would "assume and become liable for, and shall pay, perform and discharge as and when due all of the Assumed Liabilities." Section 2.3 defines

ties to Pneumo Abex Corporation. The net result of this transaction was that Abex no longer held a corporate relationship with The Henley Group.

**17.** Thus, PA Holdings/PAC 2 consists of the stock, assets and liabilities of Abex Corporation and PAC 1.

**18.** Claims under the Plan were not based on "the conduct of", "claims against", or "demands on" the Debtors; the Debtors did not manufacture, distribute, or sell the friction products at issue. Cooper and Pneumo Abex are not alleged to be liable for the "conduct of", "claims against", or "demands on" the Debtors. Rather, the Pneumo Abex Claimants have

claims against Pneumo Abex which Cooper is allegedly required to indemnify by virtue of the Mutual Guaranty Agreement. In turn, FMC has agreed to indemnify Cooper if Cooper is called on to perform on its guaranty, thus giving Cooper contingent and unliquidated claims against a Debtor. To the extent a Debtor is ever alleged to be liable in [*sic*] this claim, the liability all stems from Pneumo Abex's conduct and products. Therefore, it is the Debtors' alleged liability that is derivative of Pneumo Abex's.

*In re Federal–Mogul Global Inc.,* 411 B.R. 148, 166 (Bankr.D.Del.2008). *See* text *infra.*

Assumed Liabilities and is reproduced in Appendix C. The definition in Section 2.3 excludes "Retained Liabilities" which are defined in Section 2.4. *See* Appendix D. That section defines Retained Liabilities to include "all liabilities and obligations of Seller to Whitman under the Whitman Agreements." Section 2.4(g). Thus, Debtor FMP, successor to Wagner, agreed to indemnify PAC 2 only for the Assumed Liabilities. The Retained Liabilities stayed with what is now PAC 2.[19] Abex, Inc., the owner of PAC 2 (Abex Corporation/PA Holdings), and Cooper Industries, Inc., of which Wagner was an indirect subsidiary, guaranteed the performance of PAC 2 and Wagner, respectively, under the 1994 APA.

In 1996 Wagner merged into Moog Automotive, Inc., a subsidiary of Cooper Industries, Inc. and the remaining entity was Moog. In 1998 Cooper sold to Debtor Federal–Mogul Corporation ("FMC") its automotive products business which included 100 percent of the shares of Moog and other assets. In this transaction FMC assumed Cooper's guaranty obligations under the 1994 APA for "the operation of and products manufactured or sold by the Wagner industrial brake business including" those liabilities related to asbestos in the brakes. 1998 P & SA at Section 5.12(b), referring to Section 5.12(a)(x). Moog thereafter changed its name to FMP. FMP, therefore, was the successor to Wagner's indemnity obligation under the 1994 APA. *See* Appendix B. That is, FMP undertook Wagner's obligations and FMC guaranteed FMP's performance.

*Analysis*

As explained in our 2008 opinion issued in this case at 411 B.R. 148 (Bankr.D.Del. 2008),

As is shown by the history of corporate transactions and agreements, there are several remaining obligations between Pneumo Abex, Cooper, FMP, and FMC related to the Pneumo Asbestos Claims. The obligation that runs in favor of Pneumo Abex, in simplified form, can be described thus: Pursuant to the 1994 APA, Wagner indemnified Pneumo Abex [PAC 2] for certain asbestos related liabilities, i.e., asbestos-related personal injury claims against Pneumo Abex and its affiliates received after August 29, 1998—the Pneumo Asbestos Claims. Wagner later merged into Moog which was sold to FMC in 1998. After the sale, Moog's name was changed to Federal–Mogul Products, Inc. (FMP). FMP now owes to Pneumo Abex the indemnity that was originally provided by Wagner in the 1994 APA. The obligations that arise from the relationship with Cooper are twofold. The first concerns a guaranty. In connection with the 1994 APA, Cooper gave a Mutual Guaranty Agreement to guarantee Wagner's performance under the indemnity it granted in favor of Pneumo Abex. When FMC purchased Moog (now known as FMP), FMC assumed that guaranty. Thus, FMC is now the guarantor of FMP's performance of the indemnity owed to Pneumo Abex. The second obligation is an indemnity owed to Cooper. To the extent that Cooper is ever called upon to perform under its guaranty, FMC indemnified Cooper and agreed to defend and hold Cooper harmless against Cooper's obligations under the mutual guaranty. Thus, Cooper may hold unliquidated contingent claims against FMC and holds liquidated non-contingent claims to the extent that it

---

**19.** In other words, at the time the 1988 SPA was executed, "Seller" was still IC Industries. IC Industries became Whitman and later became PAS. Any obligation guaranteed by FMP to PAS does not include the claims PAS has filed in these bankruptcy cases.

has performed on the guaranty. The bottom line is that both Pneumo Abex and Cooper, now or in the future, may hold claims against FMP or FMC related to the intricacies of the contractual relationships of the parties. What is equally as clear is that the Pneumo Asbestos Claims evolved from the conduct and products of Pneumo Abex and its predecessors and not in any way from the conduct of, claims against or demands on the Debtors.

411 B.R. at 162–63. At the time of the Cooper/Abex, Inc. Mutual Guaranty Agreement of 1994, the Pneumo Abex referred to above was the entity identified herein as PAC 2, an entity not related to PAS.

At some point, PAS, as Whitman's successor, retained indemnity obligations created under the 1988 SPA. However, Section 11.2 of the 1994 APA describes limitations on indemnification obligations. *See* Appendix E. In his Declaration,[20] Steven L. Fasman, President of Pneumo Abex LLC, explained that FMP assumed liability for indemnification for asbestos-related claims arising from the Abex Brake Business, Cooper guaranteed FMP's performance in this regard, and PAS indemnified for other asbestos-related claims. Doc. 12606 at 5, ¶ 13. Further, Section 11.7 of the 1994 APA addresses specific limitations with respect to the Whitman Agreements (the 1988 SPA, the First Amendment dated August 29, 1988, and the Second Amendment dated September 23, 1991). *See* Appendix F, Section 11.7, Special Procedures and Limitations Relating to Whitman Indemnified Liabilities. We must therefore

examine the relevant portions of the 1994 APA.

Under the 1994 APA Wagner (FMP) became liable for certain asbestos claims related to Abex's operations which had not been indemnified by PAS under the 1988 SPA. Wagner (FMP) also assumed other liabilities. *See* 1994 APA Section 2.3, Appendix C. Assumed liabilities include, *inter alia,* certain employee, tax and environmental matters (Articles VI, VII and VIII) and the indemnification provisions identified in Article XI. The environmental matters in Article VIII and the other Assumed Liabilities do not include the liabilities that Pneumo Abex retained which are defined in the agreement in Section 2.4 as, *inter alia,* "(g) all liabilities and obligations of Seller (Pneumo Abex Corporation) to Whitman (PAS) under the Whitman Agreements." Appendix D. *See also* Declaration of Steven L. Fasman, Doc. No. 12606, at 16–18, ¶¶ 54–58. "Retained Asbestos Product Liabilities" are defined in Article I of the 1994 APA:

"Retained Asbestos Product Liabilities" shall mean all liabilities and obligations relating to claims or causes of action to the extent related to presence of asbestos in any product shipped (i) by the Business [Abex/Pneumo Abex] prior to August 29, 1988[,] that are subject to indemnification under Section 12(b) (iii) or (v) of the Whitman Stock Purchase Agreement [1988 SPA] and as to which claims or causes of action Seller [Pneumo Abex] shall have given Whitman notice under the Whitman Agreements prior to the close of business on August 29, 1998, (ii) by the railroad products division of a predecessor of Seller and such division's predecessors, or (iii) by the

---

**20.** Mr. Fasman's declaration was filed in connection the Joint Memorandum of Cooper Industries, LLC and Pneumo Abex LLC in Support of Section 524(g)(4)(A)(ii) Injunctive Relief for the Pneumo Protected Parties Un-

der the Plan A Addendum to the Fourth Amended Joint Plan of Reorganization, Doc. No. 12602. This court's 2008 Memorandum Opinion discussed Cooper's claims.

Business on or after August 29, 1988[,] but prior to the Closing Date which claims or causes of action are filed on or prior to August 29, 1998[,] (other than workers' compensation claims and toxic tort claims described in Section 6.3(c)(D)); *provided, however,* that upon the occurrence of a Whitman Event, the liabilities and obligations described in clauses (i) and (ii) above shall cease to be Retained Asbestos Product Liabilities and shall become Assumed Liabilities for all purposes under this Agreement.

1994 APA at 10–11. Under Section 8.3 PAC 2 agreed to retain certain liabilities under the Whitman Agreements [21] "forever," Section 8.3(a) at 84,[22] but because of the severance of the corporate relationships, PAS's remedies, if any, are not against the Debtors here.

PAC 2 has the right either to perform remedial actions it is liable for under the agreement or to have Wagner (FMP) perform the work in which case PAC 2 will reimburse FMP, but Whitman (PAS) nonetheless retained the right to control the details of the work or to perform the remediation. *See* Section 8.4(c) at 84. Section 8.5 recites limitations on PAC 2's environmental indemnification obligation. Wagner (FMP) agreed not to take any action it knew would result in Pneumo Abex violating the Whitman Agreements in any way. Section 8.5(d). Even if Wagner (FMP) did so, it is PAC 2, not PAS, that would have recourse against Wagner. If there is a breach, PAS's remedies are

---

**21.** *"Whitman Agreements"* are defined as "(i) the Whitman Stock Purchase Agreement, and (ii) the Settlement Agreement between Whitman Corporation and Pneumo Abex Corporation dated as of September 23, 1991."

*"Whitman"* is defined as "Whitman Corporation (formerly IC Industries, Inc.), a Delaware corporation, and any successor thereto."

*"Whitman Event"* is defined as "the earlier of the commencement of any proceedings with respect to Whitman under any bankruptcy...."

*"Whitman Indemnifiable Retained Environmental Liabilities"* shall mean all liabilities and obligations relating to environmental matters, including all Environmental Liabilities and Costs, to the extent relating to the Assets or the Business that are subject to indemnification by Whitman under Section 12(b) (ii) (solely with respect to Section 6(e) of the Whitman Stock Purchase Agreement), Section 12(b) (iii) or Section 12(b) (vi) of the Whitman Stock Purchase Agreement and with respect to which, either Seller shall have given Whitman notice under the Whitman Agreements or Buyer shall have given written notice to Seller in each case on or prior to the fourth anniversary of the Closing Date, which notification of a claim shall specify in reasonable detail the legal and factual bases therefor, in which case Seller's obligations hereunder shall continue until such claim is finally resolved; provided, however, that upon the occurrence of a Whitman Event, all such liabilities and obligations (other than Retained Liabilities referred to in Sections 2.4(a), (d) or (h) of this Agreement, which shall continue to be Retained Liabilities) shall cease to be Whitman Indemnifiable Retained Environmental Liabilities, and shall become Assumed Liabilities for all purposes under this Agreement.

*"Whitman Indemnified Assumed Liabilities"* shall mean Assumed Liabilities that are subject to indemnification from Whitman pursuant to the Whitman Agreements.

*"Whitman Indemnified Liabilities"* shall mean liabilities which are subject to indemnification from Whitman pursuant to the Whitman Agreements.

*"Whitman Stock Purchase Agreement"* shall mean the, Stock Purchase Agreement dated as of April 28, 1988, between IC Industries, Inc. and PA Holdings Corporation, as amended by a First Amendment dated as of August 29, 1988, by a Second Amendment executed on September 23, 1991, and by the letter dated November 19, 1991, from Barbara B. Guibord to Martin M. McNerney (relating to a protocol for asserting insurance claims).

**22.** This statement is accompanied by a citation to Section 8.2(h) which provides that Pneumo Abex had delivered to FMP a copy of the Whitman Agreements, that those Agreements were valid and binding on Pneumo Abex and in full force and effect.

with respect to PAC 2 to the exclusion of Wagner (FMP).

This conclusion is buttressed by Section 8.5(d) of the 1994 APA which provides:

Seller (PAC 2) has furnished to Buyer (Wagner/FMP) copies of the Whitman Agreements. Buyer shall not take any action which to its knowledge would result in Seller violating any of the provisions of the Whitman Agreements applicable to Seller with respect to the Business, Assets and Assumed Liabilities and Buyer shall reasonably assist and cooperate with Seller in complying with its obligations under the Whitman Agreements.

Section 8.5(d) at 88. Sections 8.4 through 8.7 make it clear what the responsibility for environmental liabilities is. Although Section 8.7 is entitled "Buyer's (Wagner/FMP) Environmental Indemnification," the indemnification applies only to those liabilities "arising out of or relating to the Business, any Asset or any Assumed Liability, except to the extent such Environmental Liabilities and Costs are subject to indemnification or remediation by Seller (PAC 2)." *Id.* at 88–89. Section 8.8 states that the remedies are exclusive and apply to "Seller and its Continuing Affiliates" and "Buyer and its Affiliates." "Continuing Affiliates" is defined as "any Affiliate of Seller other than the Canadian Subsidiary." Section 1.1 at 5. "Seller" is defined as Pneumo Abex (PAC 2),[23] and "Buyer" is defined as Wagner (later to become FMP),[24] but, with respect to indemnifications, the "Seller Indemnified Parties" are defined as

Seller, the Continuing Affiliates, each of their present or former respective directors, officers, employees and agents, and each of the heirs, executors, successors and permitted assigns of any of the foregoing

*id.* at 12, and "Buyer Indemnified Parties" are defined as

Buyer, Buyer's Affiliates (including the Canadian Subsidiary after the Closing Date), each of their present or former respective directors, officers, employees and agents, and each of the heirs, executors, successors and permitted assigns of any of the foregoing.

*Id.* at 3. The affiliation between PAC 2 and PAS was severed before 1994, as described above. Article XI (Survival; Indemnification) does "not apply to any Covered Liabilities arising under Environmental Laws (including Assumed Liabilities and Retained Liabilities referred to in Article VIII" and certain other liabilities inasmuch as "the provisions of Article VIII [are] the sole and exclusive provisions of" the 1994 APA). Section 11.1 at 96. The agreement further states that payments under Article XI will be treated as an adjustment to the purchase price. After the closing the agreement specifies that the indemnifications

expressly provided in this Agreement shall be the exclusive remedy for any breach of any representation, warranty, covenant or agreement in this Agreement, the Other Seller Agreements and the Other Buyer Agreements by either party.

*Id.* at 11.1(c). "Other Buyer Agreements" are defined in Section 4.1 as those required to be executed by Buyer so it can "consummate the transactions contemplated" by the 1994 APA. *Id.* at Section 1.1 at

**23.** Page 12 of the 1994 APA defines "Seller" as having "the same meaning set forth in the first paragraph hereof." The first paragraph of the agreement defines Seller as Pneumo Abex Corporation.

**24.** The identity of the Buyer is on the same pages as that of the Seller, i.e., 12 and 1.

9, Section 4.1 at 41. The "Other Seller Agreements" are defined similarly in Section 3.1(c). *Id.*, Section 3.1(c) at 32. None of these sections gives PAS rights against the Debtors.

PAS argues that Debtors are liable to it for conversion of policy proceeds, Doc. No. 12325 at 17–19, and under the doctrine of waste (impairing the value of PAS's property). *Id.* at 20. PAS sets forth no facts supporting the theories of conversion or waste. Further, any claim PAS may have is not against these Debtors. Although predecessors in interest of PAS and Debtors agreed to indemnification with respect to certain claims under certain circumstances, those circumstances and claims are not such as would support PAS's proof of claim and amended proof of claim.

PAS asserts a right of subrogation with respect to the indemnities under the 1988 SPA and 1994 APA. In part this position is based on the fact that the 1994 APA included notice to FMP (then Wagner) of the terms of the 1988 SPA. However, the 1994 APA is also clear on what liabilities and obligations the parties to it assumed and the 1988 and 1994 agreements do not support PAS's position. *See* Appendices C, Section 2.3, 1994 APA, Assumption of Liabilities, and D, Section 2.4, 1994 APA, Retained Liabilities. *See also* Appendix G, Section 11.3, 1994 APA, Indemnification by Buyer; Appendix H, Section 11.4, 1994 APA, Indemnification by Seller.

PAS also contends that it is a third-party beneficiary of the agreements. However, Section 13.3 of the 1994 APA provides to the contrary:

> *Entire Agreement; No Third–Party Beneficiary.* This Agreement (including the instruments, agreements, documents and certificates referred to or incorporated herein), together with the Schedules and Exhibits hereto and the Confidentiality Agreement, contain the entire agreement between the parties with respect to the subject matter hereof and there are no agreements, understandings, representations or warranties between the parties other than those set forth or referred to herein or therein. *Except for Sections 7.2, 7.3, 8.4, 8.7, 11.3 and 11.4, which are intended to benefit, and to be enforceable by, any of the Seller Indemnified Parties and the Buyer Indemnified Parties, as the case may be, this Agreement is not intended to confer upon any Person not a party hereto (other than the parties' respective successors and assigns as permitted by Section 13.6) any rights or remedies hereunder. Nothing in this Agreement is intended to relieve or discharge the obligation of any third Person to (or to confer any right of subrogation or action over against) any party to this Agreement.*

(Emphasis added.) The sections excepted from Section 13.3 are as follows:

7.2 Tax Indemnity and Covenants by [Pneumo Abex]

7.3 Tax Indemnity by [Wagner (FMP)]

8.4 [Pneumo Abex's] Environmental Indemnification and Remediation

8.7 [Wagner's (FMP)] Environmental Indemnification 11.3 Indemnification by [Wagner (FMP)]

11.4 Indemnification by [Pneumo Abex]

The tax indemnities in Sections 7.2 and 7.3 are not at issue. The indemnifications in Sections 8.4, 8.7, 11.3 and 11.4 all have limitations and exceptions which relate back to the Whitman Agreements and are of no help to PAS. *See* Appendices I, J, K, and L, respectively.

*Summary*

Relevant sections of the 1988 SPA and the 1994 APA describing the obligations undertaken by the various entities are in Appendices to this Memorandum Opinion. Based on the corporate history and the documentation [25] provided to the court, we find that PAS does not have a claim against FMC or FMP. PAC 2, through which PAS would have to claim, long ago became an entity distinct from any PAS-related entity. Through the various corporate transfers in connection with the Henley-related entities, PAC 2 is a legal entity separate from those in the PAS line that retained liabilities or issued guarantees. As noted in our 2008 Memorandum Opinion, PAC 2 may now or in the future hold claims against FMP or FMC, 411 B.R. at 162–63, but PAS does not have a claim as any such claim would have to be through PAC 2 which no longer is an entity related to PAS. Thus, PAS has not established entitlement to a claim and Debtors' Motion for Summary Judgment will be granted.

An appropriate order will be entered.

### ORDER GRANTING DEBTORS' MO-TION FOR SUMMARY JUDGMENT AND SUSTAINING THEIR OBJEC-TION TO THE CLAIM OF PEP-SIAMERICAS, INC.

AND NOW, this *27th* day of *October,* 2010, for the reasons expressed in the foregoing Memorandum Opinion, it is OR-DERED, ADJUDGED AND DECREED that Debtors' objection to the amended proofs of claim filed by PepsiAmericas, Inc., is **SUSTAINED.**

It is **FURTHER ORDERED** that Debtors' motion for summary judgment is **GRANTED** and judgment is entered in favor of Debtors Federal–Mogul Corporation and Federal–Mogul Products, Inc. and against PepsiAmericas, Inc., on the Objection to Claim. Claim Numbers 6093 and 6441 are disallowed.

### *APPENDIX A*

*In re Federal–Mogul Global Inc.,* 411 B.R. 148, 160–62 (Bankr.D.Del.2008) (footnotes omitted).

A. FACTUAL BACKGROUND

A review of the applicable corporate and transactional history is necessary to understand the relationship between the Pneumo Protected Parties (including Cooper and Pneumo Abex_, the Debtors, and the Pneumo Asbestos Claims).

The American Brake Shoe & Foundry Company was organized in New Jersey in 1902 and reincorporated as a Delaware Corporation in 1916. American Brakeblok Corporation, a subsidiary of the American Brake Shoe began manufacturing asbestos-containing products in the 1920s. In 1937, American Brakeblok Corporation merged into its parent, American Brake & Shoe Foundry Company, forming what be-

---

25. After its proof of claim and amended proof of claim were filed with supporting documentation, PAS provided to the court certain documents filed under seal. We have examined those documents and find that they do not help PAS's cause. The documents under seal are: May 2000 Confidential Settlement Agreement between Pneumo Abex Corporation and Whitman Corporation, December 2002 Final Settlement Agreement Between Pneumo Abex Corporation and Maryland Casualty Company, and December 2006 Confidential Settle-ment Agreement And Release between Pneumo Abex LLC, as Successor by Merger to Pneumo Abex Corporation, Cooper Industries, LLVC, PepsiAmericas, Inc., Federal–Mogul Products, Inc. and Federal–Mogul [C]orporation and Certain Underwriters at Lloyd's. The 2006 Confidential Settlement resolved a coverage lawsuit filed in 2005 in the United States District Court for the District of Columbia with respect to certain Lloyd's policies.

came known as the Friction Products Division, which contained the Abex Brake Business. The American Brake Shoe & Foundry Company changed its name to American Brake Shoe Company in 1943, and then to Abex Corporation in 1966.

In 1968, Illinois Central Industries, Inc. ("IC Industries," a predecessor to Whitman Corporation and ultimately PepsiAmericas) acquired Abex Corporation, including its Abex Brake Business, through a merger of IC Industries' subsidiary Illinois Abex Corporation into the Abex Corporation. Thus, the Abex Corporation survived as a wholly-owned subsidiary of IC Industries. In 1984, Pneumo Corporation was acquired by IC Industries as a wholly-owned subsidiary under a similar arrangement as Abex Corporation. In 1985, Pneumo Corporation was renamed Pneumo Abex Corporation.

The "Pneumo Asbestos Claims" as defined in The Plan A Settlement stem from alleged exposure to asbestos containing friction products manufactured by the Abex Brake Business of the Friction Products Division of the Abex Corporation. The Abex Corporation and its predecessors manufactured and distributed various brake products, including asbestos-containing automotive brake products. The Abex Corporation ceased selling asbestos-containing products in 1987.

In 1988, IC Industries, Inc., sold the capital stock of Abex Corporation, Pneumo Abex Corporation, and other subsidiaries to PA Holdings Corporation, an affiliate of The Henley Group. In June and August of 1990, the assets and liabilities of Pneumo Abex Corporation and Abex Corporation were consolidated into their parent, PA Holdings Corporation. Both Abex Corporation and Pneumo Abex Corporation ceased to exist subsequent to this 1990 "roll-up." In November of 1990, PA Hold-

ings Corporation was renamed Pneumo Abex Corporation, which is a different legal entity from the aforementioned Pneumo Abex Corporation that was part of the 1990 "roll-up."

In 1992, the Henley Group engaged in a series of transactions, the net effect of which was to spin off Pneumo Abex Corporation into an entity that would be independent of the Henley Group. Specifically, the owner of the Pneumo Abex Corporation, Henley Investment Inc. (a subsidiary of The Henley Group, Inc.) changed its name to Abex Inc. in 1992. Then, pursuant to an Agreement and Plan of Merger dated as of March 26, 1992, The Henley Group, Inc. distributed all of the issued and outstanding shares of the common stock of Abex Inc. to the holders of the common stock of The Henley Group, Inc. Concurrent with the Agreement and Plan of Merger, The Henley Group, Inc., through multiple transactions, transferred certain of its assets and liabilities to Pneumo Abex Corporation. The net result of this transaction was that Abex no longer held a corporate relationship with The Henley Group.

Pursuant to an asset purchase agreement dated November 21, 1994 (the "1994 APA"), Pneumo Abex Corporation sold certain of the assets of its friction products division (assets associated with its automotive brake business) to Wagner Electric Corporation ("Wagner"), an indirect subsidiary of Cooper Industries, Inc. The assets Wagner acquired included real property, leases, machinery, equipment, furniture, computers, motor vehicles, tools, parts, raw materials, supplies license agreements, computer software, business books and records, credits, security deposits, accounts and notes receivable, and others. In the 1994 APA, Wagner agreed to indemnify Pneumo Abex for certain of its

liabilities, including certain asbestos-related liabilities. The indemnity provision in Section 2.3 of the 1994 APA states that Wagner "shall assume and become liable for, and shall pay, perform and discharge as and when due all of the Assumed Liabilities." The indemnity provisions allocated liabilities between Wagner and Pneumo Abex. They did not impact the claims against either party that may be brought directly by an asbestos claimant. Section 13.3 of the 1994 APA states that "this Agreement is not intended to confer upon any Person not a party hereto ... any right or remedies hereunder." In connection with the 1994 Transaction, Abex Inc. and Cooper Industries, Inc., entered into a Mutual Guaranty Agreement, dated December 30, 1994. Under the Mutual Guaranty Agreement, Cooper Industries, Inc. and Abex Inc. each guaranteed "the full and faithful performance of their respective subsidiaries (Pneumo Abex and Wagner, respectively) with respect to the [1994] asset purchase agreement."

In 1996, Wagner merged into another Cooper subsidiary, Moog Automotive, Inc., leaving Moog as the surviving entity. Under a stock purchase agreement between Cooper Industries, Inc. and Federal–Mogul Corporation ("FMC") dated August 17, 1998 (the "1998 [P & SA]"), Cooper Industries sold its automotive products business (shares of Moog, along with other assets) to Federal–Mogul Corporation. Pursuant to the 1998 [P & SA], Federal–Mogul Corporation assumed Cooper Industries, Inc.'s mutual guaranty obligations related to the 1994 APA and indemnified Cooper for any liability related to the mutual guaranty. Following this transaction, Moog Automotive Products, Inc. (as Moog Automotive, Inc. was renamed in 1998) changed its name to Federal Mogul Products, Inc. ("FMP"). FMP, in its capacity as the successor to the indemnity obligation originally undertaken by Wagner in the 1994 APA, took responsibility for handling the Pneumo Asbestos Claims. After August 29, 1998, "[a]n asbestos-related claim arising out of the friction products division received ... by Pneumo Abex would have been subject to the assumed liabilities under the APA and indemnified by [FMP]." In total, FMP defended more than 10,000 Pneumo Asbestos Claims. On October 1, 2001, the Debtors filed 157 Chapter 11 cases and complementary administrations for 134 of the Debtors in the United Kingdom. On the petition date, "Pneumo Abex called upon Cooper to perform under its mutual guaranty obligation." Cooper took responsibility for managing the claims and "has performed under that guaranty [ever] since."

### APPENDIX B

*In re Federal–Mogul Global Inc.*, 2007 WL 4180545 at *13–15 (Bankr.D.Del.2007) (citations omitted).

**Wagner Claims (Certain Asbestos Personal Injury Claims Asserted Against Debtor Federal–Mogul Products, Inc.)**

a. *Background Concerning Wagner Business*

i. Wagner Electric Corporation ("Wagner") was originally incorporated in Delaware in 1922, and manufactured, distributed and sold a broad range of electrical and automotive products, including certain asbestos-containing automotive and industrial brake products.

ii. Wagner went through several changes of corporate ownership prior to the acquisition of the Wagner business by the Federal–Mogul Group. In particular, in 1967 all of the stock of Wagner was purchased by Studebaker Corporation, which was in turn a wholly-owned subsidiary of Studebaker–Worthington, Inc.

("Studebaker–Worthington"). On October 23, 1979, the common stock of Studebaker–Worthington was purchased by Edison International, Inc. ("Edison"), which was a wholly-owned subsidiary of McGraw–Edison Company ("McGraw–Edison"). On January 2, 1981, Studebaker–Worthington merged into Edison, resulting in Wagner becoming a subsidiary of Edison, which, in turn, was a direct subsidiary of McGraw–Edison.

iii. In 1985, Cooper Industries, Inc. purchased all of the stock of McGraw–Edison. As a result of this transaction, Wagner became an indirect wholly-owned subsidiary of Cooper Industries, Inc. On January 1, 1997, Wagner was merged into another wholly-owned subsidiary of Cooper Industries, Inc., Moog Automotive, Inc. ("Moog"). The combined Wagner/Moog entity retained the Moog name.

iv. In 1998, certain entities within the Federal–Mogul Group acquired the common stock of certain businesses owned by Cooper Industries, Inc., including Moog. Subsequent to that acquisition, Moog was renamed Federal–Mogul Products, Inc. ("FMP").

b. *Background Concerning Wagner Asbestos Claims*

i. Wagner asbestos personal injury claims concern various asbestos-containing friction products. Almost all of these claims, however, concerned Wagner's role in the assembly (rather than the manufacture) of asbestos-containing brake products. Specifically, Wagner sold brake assemblies (including backing plates and other connected apparatus) to over 75 original equipment manufacturers until 1982, including Volvo, NAPCO, Mack Truck, International Harvester, General Motors, Ford, Dodge, Clark Equipment, Chrysler Canada, American Motors Corporation, and Disneyland. Wagner friction products were distributed and sold nationwide under the brand names Comax, Wagner Comax, Wagner Lockheed, Wagner Lockheed Comax, Wagner, and Chatham. In addition, Wagner also sold brake block lining from approximately 1940 to 1968. Wagner also sold various aftermarket brake assemblies.

ii. Wagner purchased friction material containing, among other components, chrysotile asbestos modified by a bonding agent, coating or binder or other materials and assembled this material with other, non-asbestos-containing components into brake shoes, disc pad assemblies and clutch facings. It always obtained its friction materials from other manufacturers, which manufactured the materials according to performance standards specified by Wagner.

iii. The first asbestos personal injury lawsuit against Wagner was filed in 1979. Between October 1, 1998 and the Petition Date, over 51,000 asbestos-related personal injury and wrongful death claims were filed against Wagner (or Moog or FMP as successors to Wagner). As of the Petition Date, there were approximately 33,000 pending asbestos personal injury claims that named Wagner as a defendant and/or Moog or FMP as successor-in-interest to Wagner.

### Other Asbestos Personal Injury Claims Asserted Against the Debtors

a. *Abex Claims*

i. In addition to the "streams" of liability for Asbestos Personal Injury Claims described above, certain of the Debtors have also been responsible for the processing, defense, and payment of Asbestos Personal Injury Claims relating to land vehicle friction products manufactured by Abex Corporation. As described . . . above, in 1998 certain entities within the

Federal–Mogul Group acquired the stock of a number of companies from Cooper Industries, Inc., including the stock of Moog Automotive, Inc. (successor to Wagner Electric Corporation), which was renamed Federal–Mogul Products, Inc.

ii. In 1994, Wagner Electric Corporation had acquired the Abex land vehicle friction products business from Pneumo Abex Corporation, the successor to Abex Corporation. In connection with that transaction, Wagner Electric Corporation agreed to become liable for and to indemnify Pneumo Abex Corporation from, on an after-insurance basis, certain asbestos-related claims against Pneumo Abex relating to the business Wagner purchased from Abex, which obligations became liabilities of Federal–Mogul Products, Inc. (as the successor to Moog Automotive, Inc.) when Moog Automotive, Inc. and various other companies were acquired by the Federal–Mogul Group from Cooper Industries, Inc. in 1998.

iii. During the period between the acquisition of Moog Automotive, Inc. in 1998 and the Petition Date, F–M Products defended Pneumo Abex Corporation against asbestos-related personal injury claims related to the Abex land vehicle friction products business. As of the Petition Date, there were approximately 66,000 asbestos personal injury claims pending against Pneumo Abex that were related to the Abex land vehicle friction products business. Following the Petition Date, Federal–Mogul Products, Inc. stopped performing its indemnity of Pneumo Abex.

iv. Asbestos personal injury claims relating to land vehicle friction products manufactured by Abex Corporation have been asserted by certain plaintiffs against both Federal–Mogul Products, Inc. and Federal–Mogul Corporation, purportedly as successors-in-interest to Abex Corporation and/or Pneumo Abex Corporation.

v. During the period for which Federal–Mogul Products, Inc. was responsible for the handling and defense of asbestos claims relating to the Abex land vehicle friction products businesses (i.e., from the acquisition of Moog Automotive, Inc. in 1998 through the Petition Date), Federal–Mogul Products, Inc. incurred approximately $22.3 million in defense costs and made approximately $12.4 million in indemnity payments relating to such claims.

c. Asbestos Personal Injury Claims Against Federal–Mogul Ignition U.K. Limited. Federal–Mogul Ignition (U.K.) Limited ("F–M Ignition UK") is a U.K. Debtor that has historically operated out of a facility in Upton, England. It is neither a subsidiary of T & N nor a historical affiliate of T & N. F–M Ignition UK is one of the companies that was acquired by various entities within the Federal–Mogul Group from Cooper Industries, Inc. in 1998 in the same transaction in which the stock of Moog Automotive, Inc. (now Federal–Mogul Products, Inc.) was acquired.... Prior to the Petition Date, F–M Ignition UK was named as a defendant with respect to two asbestos personal injury claims in the United Kingdom. .

### APPENDIX C

*Section 2.3 of the 1994 APA*

*Assumption of Liabilities.* Notwithstanding anything to the contrary herein (other than Retained Liabilities), at and effective as of the Closing, Buyer shall assume and become liable for, and shall pay, perform and discharge as and when due all of the Assumed Liabilities (as defined below). The Assumed Liabilities shall mean all debts, liabilities, claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, fixed or

contingent, asserted or unasserted, liquidated or unliquidated, arising prior to or after the Closing) of Seller, to the extent arising out of or relating to the Assets or the conduct or operation of the Business, other than the Retained Liabilities (the "Assumed Liabilities"). Without limiting the generality of the foregoing, the Assumed Liabilities shall include but not be limited to the following liabilities and obligations of Seller (other than Retained Liabilities):

(a) all obligations and liabilities accrued or reserved against in the Final Closing Balance Sheet;

(b) all obligations and liabilities to the extent related to the Business of the type accrued or reserved against in the Final Closing Balance Sheet;

(c) all accounts payable and trade obligations related to the Business;

(d) all liabilities and obligations arising from commitments (in the form of accepted purchase orders, or otherwise) to sell products, or outstanding quotations, proposals or bids, primarily related to the Business;

(e) all liabilities and obligations arising from' commitments (in the form of issued purchase orders or otherwise), or outstanding quotations, proposals or bids, to purchase or acquire raw materials, components, supplies or services, primarily related to the Business;

(f) all liabilities and obligations under Contracts, Leases and Government Permits;

(g) all liabilities and obligations under Article VI, Article VII and Article VIII that Buyer has agreed to assume, pay for or be responsible for;

(h) all liabilities and obligations of Seller or any Affiliate of Seller under the Guaranties;

(i) all other liabilities and obligations with respect to which Buyer is obligated to indemnify Seller or the Seller Indemnified Parties under this Agreement as set forth in Article VII, Article VIII and Article XI;

(j) all liabilities and obligations with respect to any warranty or similar liabilities relating to products of the Business which were designed, manufactured, serviced or sold on or prior to the Closing Date or which were held in the inventory, used or held for use primarily in the Business as of the Closing Date;

(k) all liabilities and obligations for death, personal injury, other injury to persons or property damage relating to, resulting from, caused by or arising out of, directly or indirectly, use of or exposure to any of the products of the Business (or any part or component) designed, manufactured, serviced or sold, or services performed, by the Business, including any such liabilities or obligations for negligence, strict liability, design or manufacturing defect, conspiracy, failure to warn, or breach of express or implied warranties of merchantability or fitness for any purpose or use;

(l) all liabilities and obligations relating to, resulting from, caused by or arising out of, directly or indirectly, the Business or any assets or property used, manufactured, sold, leased, owned or operated, or services performed, in connection with the Business at any time including those which constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of, or noncompliance with, any Law or Government Permit, including any relating to workers' compensation, occupational health and safety, occupational disease, occupational injury, toxic tort or Environmental Law (including the removal or

remediation of asbestos in buildings or building interiors), subject to the provisions of Article VI and Article VIII;

(m) all liabilities and obligations arising out of asbestos-related Actions for death, personal injury or property damage relating to or arising out of the Assets or the Business;

(n) all liabilities and obligations to the extent arising out of Actions relating to or arising out of, directly or indirectly, the Business or the use, manufacture, sale, ownership, lease, operation or disposition of any of the assets or property of the Business;

(*o*) any retrospective premiums, reinsurance payments under reimbursement contracts or other adjustments under any insurance policy maintained for the benefit of Seller or any of its Affiliates or their respective predecessors covering any liability or obligation that is an Assumed Liability;

(p) all liabilities and obligations relating to environmental matters, including all Environmental Liabilities and Costs, to the extent relating to the Assets or the Business; and

(q) from and after the occurrence of a Whitman Event, (i) all liabilities and obligations described in clauses (i) or (ii) of Retained Asbestos Product Liabilities, (ii) all Whitman Indemnifiable Retained Environmental Liabilities (except to the extent such liabilities and obligations are Retained Liabilities pursuant to Sections 2.4(a), (d) or (h) of this Agreement) and (iii) all liabilities and obligations described in clause (i) of Retained Off–Site Environmental Liabilities (except to the extent such liabilities and obligations are Retained Liabilities pursuant to Sections 2.4(a), (d) or (h) of this Agreement).

*Section 2.4, 1994 APA*

*Retained Liabilities.* Notwithstanding Section 2.3, Seller shall retain, and shall continue to be responsible after the Closing Date for, the Retained Liabilities (as defined below). If any of the Retained Liabilities are liabilities or obligations of the Canadian Subsidiary, such liabilities and obligations shall be assumed by Seller on or before the closing. The term "Retained Liabilities" shall mean and be limited to the following liabilities and obligations:

(a) all liabilities and obligations to the extent arising out of the Retained Assets, including the liabilities and obligations set forth in Section 2.4(d);

(b) all liabilities and obligations Seller has expressly agreed to retain, pay for or be responsible for pursuant to Article VI, Article VII and Article VIII and any liabilities and obligations Seller expressly agrees to retain pursuant to the Supplemental Liabilities Retention Agreement;

(c) all liabilities and obligations arising out of the Management Severance Agreements dated as of April 20, 1994, between Abex Friction Products Division and certain members of management listed on Schedule 2.4(c);

(d) all Environmental Liabilities and Costs arising out of or relating to the real properties operated by Seller or its predecessors in Mahwah, New Jersey (except to the extent such liabilities and costs arise out of or relate to the Mahwah Facility Site, as to which the provisions of Article VIII shall apply) and Lindsay, Ontario;

(e) all liabilities and obligations arising out of the Consulting Services Agreements dated as of September 15, 1983 for James Hurst and Arnold Salt;

(f) other than the Guaranties, all liabilities and obligations of Seller or any Affiliate of Seller with respect to guaranties, letters of credit, letters of comfort, bid bonds and performance bonds, and all indemnification obligations of Seller under the agreements listed on Schedule 2.4(f) or any other agreements providing for the sale or spin-off of businesses previously conducted by Seller or its Affiliates;

(g) all liabilities and obligations of Seller to Whitman under the Whitman Agreements;

(h) all liabilities and obligations to the extent relating to or arising out of the operations or businesses of Seller, any Continuing Affiliate or any predecessor of any of the foregoing other than the Business (including all liabilities and obligations relating to or arising out of the following divisions or companies: the railroad products division of a predecessor to Seller and such division's predecessors (subject to Section 2.3(q), Abex Aerospace Division, SinterMet division, Cleveland Pneumatic Company, NWL Control Systems Division, Abex NWL Aerospace Division, Jetway Systems Division, Mead Fluid Dynamics, Remco Hydraulics, Defense Systems, Abex Industrial, S.A. de C.V., PAH Mexico, Inc., Abex Finanziaria S.r.l., Abex Rail S.A., Abex Industries, S.A., Ateliers et Founderies B. Piret S.A. and Abex Equipments S.A.);

(i) all liabilities and obligations under tax sharing agreements;

(j) any inter- or intra-company payables owed by the Division to Seller or any Continuing Affiliate;

(k) until the occurrence of a Whitman Event, all Whitman Indemnifiable Retained Environmental Liabilities (except to the extent such liabilities are also referred to in Sections 2.4(a), (d) or (h) which shall continue to be Retained Liabilities following the Whitman Event);

(l) all Retained Asbestos Product Liabilities until, in the case of liabilities and obligations described in clauses (i) or (ii) of Retained Asbestos Product Liabilities, the occurrence of a Whitman Event; and

(m) all Retained Off–Site Environmental Liabilities until, in the case of liabilities and obligations described in clause (i) thereof, the occurrence of a Whitman Event (except to the extent such liabilities and obligations are also referred to in Sections 2.4(a), (d) or (h) of this Agreement, which shall continue to be Retained Liabilities following a Whitman Event).

### APPENDIX E

*Section 11.2, 1994 APA*

*Survival; Limits on Indemnification.*

(a). Subject to Sections 7.7, 8.3 and 11.1(a), all representations and warranties of the parties contained in this Agreement or in any Schedule hereto, or any certificate, document or Other Buyer Agreements and Other Seller Agreements, shall survive the Closing (even if the damaged party knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect only until, and will expire on, the second anniversary of the Closing Date. Subject to Sections 7.7, 8.3 and 11.l(a), (i) all covenants or agreements of the parties contained in this Agreement or in any Schedule hereto, or any certificate, document or other instrument delivered in connection herewith, that contemplate or involve actions to be taken or obligations in effect after the Closing, including the covenants and agreements in this Article XI, shall survive the Closing (even if the damaged party knew or had reason to know of any breach of covenant or agreement at the time of Closing) and continue in full force and effect in accordance with

their terms or without termination if no termination date is specified or clearly evident from the context in which such provisions appear, and (ii) all covenants and agreements that contemplate or involve actions to be taken or obligations in effect only prior to the Closing, shall terminate and cease to be obligations as of the Closing and no claim, action or proceeding with respect to such covenants may be brought after three months from the Closing. No claim, action or proceeding may be brought with respect to any of such representations and warranties unless written notice thereof, setting forth in reasonable detail (including a reasonable specification of the legal and factual basis for such claim, in which case the liabilities and obligations arising out of such misrepresentation or breach shall continue until such claim is finally resolved) the claimed misrepresentation or breach of warranty, shall have been delivered to the party alleged to have breached such representation or warranty, prior to the second anniversary of the Closing Date. Any timely asserted claim shall not expire at the end of the survival period but shall continue to be valid and assertable (and the indemnifying party's obligation to indemnify for such a claim will survive) in each case only until such claim is finally resolved.

(b) In calculating any amount of Covered Liability payable to any Seller Indemnified Party pursuant to Section 11.3 or payable to any Buyer Indemnified Party pursuant to Section 11.4, the amount of such Covered Liability shall be reduced by (i) any insurance proceeds actually received from any third party insurance carrier offsetting the amount of such covered Liability net of any expenses incurred by the Indemnified Party in obtaining such insurance proceeds (provided that the Indemnified Party shall be obligated to rea-

sonably seek any such proceeds to which it may be entitled), (ii) the amount accrued or reserved against as a liability on the Final Closing Balance Sheet with respect to such loss less any amounts paid in cash since Closing with respect to such loss and recorded as an accrual or reserve reduction for which indemnification will not be sought (or, in the case of any such loss comprised of the loss of, or the reduced value of, any Asset, the extent to which such Asset was written down on the Final Closing Balance Sheet to reflect such reduction in value) and (iii) any recoveries from third parties (including Whitman) pursuant to indemnification (or otherwise) with respect thereto net of any expenses incurred by the Indemnified Party in obtaining such third party payment. Subject to Sections 7.7, 8.3(c) and 11.1(a), but notwithstanding any other provision to the contrary contained in this Agreement, no party shall claim indemnification under Section 11.3(ii) or Section 11.4(iii) until the aggregate dollar amount of all Covered Liabilities incurred by or asserted against such party by reason of all such breaches, after the reductions (if any) described in the immediately preceding sentence shall exceed the Basket, and, if the Basket is exceeded, the indemnifying party shall be required to pay only the amount by which such aggregate Covered Liabilities of the indemnified party for all such breaches exceeds the Basket; provided, however, that if a representation or warranty is breached because it exceeds a monetary or materiality threshold (including through use of the terms "material", "materially" or "Material Adverse Effect"), then the entire amount shall be considered Covered Liabilities and not just the excess over that threshold. Claims for indemnification under Sections 11.3(i) and (iii) and Sections 11.4(i), (ii) and (iv) shall not be subject to the Basket.

(c) The obligation and liability of either party for any and all breaches of the representations and warranties and the covenants and agreements set forth in this Agreement (other than in Sections 11.3(i) and 11.4(i) and (ii) but including Article VIII) shall not exceed, in the aggregate, the Purchase Price.

## APPENDIX F

*Section 11.7, 1994 APA*

*Special Procedures and Limitations Relating to Whitman Indemnified Liabilities.* (a) The procedures set forth in this Section 11.7 shall apply to any Covered Liability which may be a Whitman Indemnified Liability, except as otherwise provided in Article VIII. Buyer shall, from and after the Closing, undertake the management and defense of Whitman Indemnified Assumed Liabilities subject to the provisions of this Section 11.7 and the Insurance Agreement. Seller shall cooperate with Buyer in this regard (including by granting reasonable access to Seller's employees and agents who are responsible for such management process prior to the Closing Date) to facilitate a smooth transition of such management responsibilities from Seller to Buyer. Seller shall, from and after the Closing Date, continue the management and defense of the Retained Asbestos Product Liabilities, the Whitman Indemnifiable Retained Environmental Liabilities and Retained Off–Site Environmental Liabilities (to the extent which, in each case, they have not ceased to be such as a result of a Whitman Event). Buyer shall not take any action which to its knowledge would result in Seller violating any of the provisions of the Whitman Agreements applicable to Seller with respect to the Business, Assets and Assumed Liabilities and Buyer shall reasonably assist and cooperate with Seller in complying with its obligations under the Whitman Agreements.

(b) In the event Seller receives notice of any Covered Liability which may be a Whitman Indemnified Liability, Seller shall promptly provide written notice thereof to Buyer. In the event Buyer receives notice of any Covered Liability which may be a Whitman Indemnified Liability, Buyer shall promptly provide written notice thereof to Seller. Failure to give, or delay in giving, such notices shall not relieve the other party from any liability or obligation hereunder unless (and then solely to the extent) the other party is thereby damaged. Seller shall submit a claim to Whitman under the Whitman Agreements with respect to any possible Whitman Indemnified Assumed Liability requesting Whitman to pay such possible Whitman Indemnified Assumed Liability. If Whitman fails promptly to satisfy its obligations under the Whitman Agreements with respect to such claim, Seller shall from and after the Closing Date use reasonable best efforts to pursue such claim for indemnification against Whitman on behalf of Buyer, pursuant to Buyer's direction and at Buyer's expense pursuant to Section 11.7(d).

(c) Buyer and Seller shall cooperate with each other in connection with the investigation, defense, prosecution or settlement of any possible Whitman Indemnified Liability and each party shall provide the other with reasonable access to the books, records, and personnel which are pertinent thereto and which are in the possession or control of the other party. However, Seller shall not settle any indemnification claim for Whitman Indemnified Assumed Liabilities without the prior written consent of Buyer, and the Buyer shall have the right to select competent legal counsel of its choice and at its expense (subject to the reasonable approval

of Seller) who will provide legal advice and representation with respect to indemnification claims for Whitman Indemnified Assumed Liabilities. Seller shall have the right, at its option and expense, to retain separate co-counsel to participate fully in, but not control, pursuit of an indemnification claim for Whitman Indemnified Assumed Liabilities. Except to the extent prohibited by Whitman, Buyer shall at all times have the right, at its own cost, to participate fully in and direct the pursuit of any indemnification claim with respect to a Whitman Indemnified Assumed Liability and to participate fully in all meetings, discussions, negotiations, proceedings, and other aspects of or relating to any such claim. Seller shall promptly pay Buyer the amount of all proceeds which Seller receives from Whitman to the extent relating to any claim for Whitman Indemnified Assumed Liabilities, net of amounts for which Buyer shall be obligated to reimburse Seller in accordance with Section 11.7(d) to the extent not theretofore reimbursed by Buyer.

(d) Buyer shall from time to time, upon submission by Seller of a written demand therefor, promptly, but in any event within thirty (30) days after such demand, reimburse Seller for all reasonable costs and expenses incurred by Seller in investigating, defending, prosecuting or settling any claim against Whitman in respect of a Whitman Indemnified Assumed Liability; provided, however, that Buyer shall not be liable for: (i) any costs and expenses incurred by Seller through Seller's voluntary joint participation in the prosecution of any such claim as provided in paragraph (e) above, (ii) any fees for the in-house counselor other employees of Seller or any Continuing Affiliate, or (iii) any costs and expenses relating to or arising from investigating, defending, prosecuting or settling

any Whitman Indemnifiable Retained Environmental Liabilities, Retained Asbestos Product Liabilities or Retained Off–Site Environmental Liabilities.

(e) Provided that Seller has reasonably complied with its obligations under this Section 11.7 (except to the extent such instances of noncompliance do not prejudice Buyer), Seller shall not be obligated to indemnify Buyer for any Whitman Indemnified Assumed Liabilities to the extent that Seller does not receive indemnification therefor from Whitman for any reason, including (i) the occurrence of a Whitman Event, (ii) in the event any arbitrator or any court of competent jurisdiction determines that Whitman is not obligated to pay, reimburse and indemnify Seller in respect of any Covered Liability for which a claim was submitted against Whitman or renders an award in an amount less than the amount of the claim, (iii) in the event Seller settles or compromises such claim with Buyer's consent, or (iv) due to the expiration of or other limits on Whitman's indemnity coverage including any baskets".

(f) With respect to Retained Asbestos Product Liabilities, Whitman Indemnifiable Retained Environmental Liabilities and Retained Off–Site Environmental Liabilities (to the extent which, in each case, they have not ceased to be such as a result of a Whitman Event), the parties hereto intend that Seller shall, provided that Buyer has reasonably complied with its obligations under this Section 11.7 (except to the extent such instances of noncompliance do not prejudice Seller), indemnify Buyer therefor regardless of whether Seller receives indemnification from Whitman.

(g) Seller agrees that it will not enter into any amendment to the Whitman Agreements that would materially and adversely affect Buyer's rights hereunder without the prior written consent of Buyer

(which consent shall not unreasonably be withheld).

## APPENDIX G

*Section 11.3, 1994 APA*

*Indemnification by Buyer.* From and after the Closing Date, Buyer shall, except to the extent of matters indemnified by Seller hereunder, indemnify, defend and hold harmless the Seller Indemnified Parties (i) without regard to any limit in Section 11.2, from and against any and all. Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any Asset or Assumed Liability (or any asset or liability of the Canadian Subsidiary other than Retained Assets and Retained Liabilities), including any Covered Liability based on negligence, gross negligence, strict liability, tort liability, product liability, contract liability or any other theory of liability, whether an Action is brought at law (whether common or statutory) or in equity; (ii) subject to the notification and timing requirements and the limitations provided in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any breach of any representation or warranty made by Buyer under this Agreement or in any of the Other Buyer Agreements; it being understood, however, that (in addition to their being made on the date hereof) Buyer shall be deemed to have made, as of the closing Date, the representations and warranties of Buyer contained in this Agreement with the same force and effect as though made herein on and as of the Closing Date; and (iii) subject to the timing requirements set forth in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the

extent arising out of or relating to any breach of any covenant or agreement made by Buyer under this Agreement or any of the Other Buyer Agreements.

## APPENDIX H

*Section 11.4, 1994 APA*

*Indemnification by Seller.* From and after the Closing Date, Seller shall indemnify, defend and hold harmless the Buyer Indemnified Parties (i) without regard to any limit in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any Retained Asset or Retained Liability, including any Covered Liability based on negligence, gross negligence, strict liability, tort liability, product liability, contract liability or any other theory of liability, whether an Action is brought at law (whether common or statutory) or in equity; (ii) without regard to any limit in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any liability with respect to which Seller shall have agreed in writing to indemnify Buyer pursuant to Section 9.2; (iii) subject to the notification and timing requirements and the limitations provided in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any breach of any representation or warranty made by Seller under this Agreement or in any of the Other Seller Agreements; it being understood, however, that (A) (in addition to their being made on the date hereof) Seller shall be deemed to have made, as of the Closing Date, the representations and warranties of Seller contained in this Agreement with the same force and effect as though made herein on and as of the Closing Date (ex-

cept for any representations and warranties which expressly speak as of a specific date or time other than the Closing Date) and (B) the representations and warranties of Seller shall be qualified, for purposes of this Article XI, both as of the date hereof and as of the Closing Date, by reference to any Supplemental Schedules provided by Seller to Buyer pursuant to Section 5.S hereof; and (iv) subject to the timing requirements set forth in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any breach of any covenant or agreement made by Seller under this Agreement or any of the Other Seller Agreements.

## APPENDIX I

*Section 8.4, 1994 APA*

*Seller's Environmental Indemnification and Remediation.* (a) From and after the Closing Date, Seller shall indemnify, defend and hold harmless the Buyer Indemnified Parties from and against any and all (i) Pre–Closing Environmental Liabilities and Costs incurred by or asserted against any of the Buyer Indemnified Parties, (ii) Environmental Liabilities and Costs incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any Retained Asset or Retained Liability (it being understood that as long as the Mahwah Lease is in effect or in the event the purchase option contained in the Mahwah Lease is exercised by Buyer, the Mahwah Facility Site shall be an Asset for purposes of this Article VIII (other than the representations and warranties set forth in Sections 8.2(c), (d), (e), (f) and (g); provided that such representations and warranties shall not have any effect beyond the Closing Date) and (iii) Covered Liabilities incurred by or asserted against any of the

Buyer Indemnified Parties to the extent arising out of or relating to any breach of any covenant or agreement made by Seller in this Article VIII or any breach of any representation or warranty made by Seller in Section 8.2(h). The special procedures, obligations and limitations relating to Whitman Indemnified Liabilities as set forth in Section 11.7 shall apply to Seller's indemnification in Section 8.4(a) to the extent such indemnification covers Whitman Indemnified Liabilities and to the extent not inconsistent with the procedural requirements of this Article VIII.

(b) Without limiting the indemnity in Section 8.4(a), but subject in any case to the rights of Whitman to control or perform remediation activities pursuant to the Whitman Agreements and subject to Sections 8.4(c) and 8.5, Seller agrees to commence and perform, at its expense and in a reasonably timely manner, all necessary Remedial Actions with respect to the Owned Real Property, other Assets and, if ordered by a Government Authority and subject to receipt of any necessary authorizations, other locations, in each case to the extent relating to a matter for which Seller is obligated to indemnify the Buyer Indemnified Parties pursuant to Section 8.4(a). Such Remedial Actions shall be performed by Seller in accordance with the procedures set forth in Section 8.9.

Seller shall have the right, in lieu of performing any such Remedial Actions or managing Pre–Closing Environmental Liabilities and Costs for which Seller is obligated to indemnify Buyer hereunder, to have Buyer perform such Remedial Actions or manage such matters for Seller's account, subject to Whitman's rights to control or perform remediation activities pursuant to the Whitman Agreements and the limitations set forth in Section 8.5; provided, however, that Seller shall have no right to have Buyer perform Remedial

Actions with respect to Retained Assets or sites other than Owned Real Property where Hazardous Substances have been transported for disposal (including Retained Off–Site Environmental Liabilities). Such right shall be exercised by Seller by giving written notice to Buyer specifying in reasonable detail the actions Seller wishes Buyer to perform. If Buyer performs the actions specified in Seller's written notice, Seller shall reimburse Buyer, within 30 days of receipt of a reasonably itemized statement of expenses, for Buyer's expenses relating to such actions which are subject to indemnification by Seller pursuant to Sections 8.4 and 8.5.

### APPENDIX J

*Section 8.7, 1994 APA*

*Buyer's Environmental Indemnification.* From and after the Closing Date, Buyer shall indemnify, defend and hold harmless the Seller Indemnified Parties from and against any and all (i) Environmental Liabilities and Costs incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to the Business, any Asset or any Assumed Liability, except to the extent such Environmental Liabilities and Costs are subject to indemnification or remediation by Seller pursuant to Section 8.4 and (ii) Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any breach of any covenant or agreement made by Buyer in this Article VIII. All payments required to be made pursuant to this Section 8.7 shall be made without regard to any "baskets", minimums or maximums, but shall be reduced by any insurance or other proceeds received by Seller from any third party offsetting the amount of such Environmental Liabilities and Costs net of expenses incurred by Seller in obtaining such pay-

ments. To the extent Seller recovers any amount from any third party (excluding insurance carriers) in respect of Environmental Liabilities and Costs for which Buyer shall have paid any amount 'pursuant to this Section 8.7, the amount so recovered, net of any expenses incurred by Seller in obtaining such third party payment, shall be promptly refunded to Buyer, without any other right of set-off. The indemnity in this Section 8.7 shall not apply to the extent arising out of or related to: (i) acts or omissions of Seller or others acting on its behalf on or after the Closing Date, or (ii) internal costs and overhead of any of the Seller Indemnified Parties, including (x) wages, salaries and benefits of employees and (y) internal expenses related to photocopying and production or reproduction of documents and materials for the use of such indemnitee.

### APPENDIX K

*Section 11.3, 1994 APA*

*Indemnification by Buyer.* From and after the Closing Date, Buyer shall, except to the extent of matters indemnified by Seller hereunder, indemnify, defend and hold harmless the Seller Indemnified Parties (i) without regard to any limit in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any Asset or Assumed Liability (or any asset or liability of the Canadian Subsidiary other than Retained Assets and Retained Liabilities), including any Covered Liability based on negligence, gross negligence, strict liability, tort liability, product liability, contract liability or any other theory of liability, whether an Action is brought at law (whether common or statutory) or in equity; (ii) subject to the notification and timing requirements and the limitations provided in Section 11.2, from and against any and all Covered Liabilities

incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any breach of any representation or warranty made by Buyer under this Agreement or in any of the Other Buyer Agreements; it being understood, however, that (in addition to their being made on the date hereof) Buyer shall be deemed to have made, as of the closing Date, the representations and warranties of Buyer contained in this Agreement with the same force and effect as though made herein on and as of the Closing Date; and (iii) subject to the timing requirements set forth in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Seller Indemnified Parties to the extent arising out of or relating to any breach of any covenant or agreement made by Buyer under this Agreement or any of the Other Buyer Agreements.

### *APPENDIX L*

*Section 11.4, 1994 APA*

*Indemnification by Seller.* From and after the Closing Date, Seller shall indemnify, defend and hold harmless the Buyer Indemnified Parties (i) without regard to any limit in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any Retained Asset or Retained Liability, including any Covered Liability based on negligence, gross negligence, strict liability, tort liability, product liability, contract liability or any other theory of liability, whether an Action is brought at law (whether common or statutory) or in equity; (ii) without regard to any limit in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any liability with respect

to which Seller shall have agreed in writing to indemnify Buyer pursuant to Section 9.2; (iii) subject to the notification and timing requirements and the limitations provided in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any breach of any representation or warranty made by Seller under this Agreement or in any of the Other Seller Agreements; it being understood, however, that (A) (in addition to their being made on the date hereof) Seller shall be deemed to have made, as of the Closing Date, the representations and warranties of Seller contained in this Agreement with the same force and effect as though made herein on and as of the Closing Date (except for any representations and warranties which expressly speak as of a specific date or time other than the Closing Date) and (B) the representations and warranties of Seller shall be qualified, for purposes of this Article XI, both as of the date hereof and as of the Closing Date, by reference to any Supplemental Schedules provided by Seller to Buyer pursuant to Section 5.S hereof; and (iv) subject to the timing requirements set forth in Section 11.2, from and against any and all Covered Liabilities incurred by or asserted against any of the Buyer Indemnified Parties to the extent arising out of or relating to any breach of any covenant or agreement made by Seller under this Agreement or any of the Other Seller Agreements.